**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-3620

HOLLY A. CAPPELLO, Psy.D.,

      Plaintiff,

v.

COLORADO DEPARTMENT OF HUMAN SERVICES,
DAVID POLUNAS, in his individual capacity, and
ALAN KENT, Ph.D., in his individual capacity.

      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

      Plaintiff, Holly Cappello, Psy.D., by and through his undersigned counsel, Mark A. Schwane, Schwane Law, LLC, hereby brings this action and, for her Complaint and Jury Demand against Defendants Colorado Department of Human Services, David Polunas, and Alan Kent, Ph.D., alleges the following:

### I. INTRODUCTION

    1.  Plaintiff Dr. Holly Cappello was a highly experienced and well-regarded psychologist in the metro Denver area. For 20 years, she worked specifically with families and children, specializing in the mental health field of Trauma Informed Care. Prior to her employment with Defendant Colorado Department of Human Services, ("CDHS"), she was employed with Aurora Mental Health Center and was, among other positions, the Director of Child & Family Outpatient Services as well as the Director of

Integrated Health.  She was qualified as an expert witness in Denver, Arapahoe and

Adams District courts as a family psychologist.  She was a trauma team lead for Aurora

Mental Health Center for victims of the Aurora theater shooting.  In 2013, she was hired

by Defendant CDHS to develop and manage a Trauma Informed Care ("TIC") program

for the Colorado Mental Health Institute at Ft. Logan ("Ft. Logan"), a state psychiatric

hospital.  In 2018, Defendant Dr. Alan Kent was hired by CDHS to serve as the Director

of Psychology and Internships for Ft. Logan.  Soon after his arrival, Dr. Kent had

conflicts with his all-female staff of team psychologists as well as Dr. Cappello.  Despite

numerous complaints to human resources by the women psychologists concerning Dr.

Kent's derogatory attitude and condescending comments towards his women

subordinates, CDHS took no action.  In 2019, private persons contacted executive

management of CDHS, complaining about a treatment decision Dr. Cappello made for a

patient (referred to as "Patient" to protect her privacy) at Ft. Logan.  In particular, this

treatment decision, which took place after research, conferral and consensus approval

of clinicians on Team 1 (Patient's treatment team), took the form of a letter Dr. Cappello

drafted, in April 2019, on behalf of Patient, to Pueblo County family court and child

protective service.  The letter to the family court offered to provide supervised visitation

for Patient and her minor child.  At the direction of Ft. Logan director Defendant David

Polunas and executive management of CDHS, who were concerned about a possibly

contentious custody case which would involve CDHS, Dr. Kent investigated the origins

of the Patient letter.  Dr. Kent, who disregarded facts and embellishing other findings,

falsely reported to Mr. Polunas that Dr. Cappello's letter on behalf of Patient was

2

unethical and was contrary to the generally accepted standard of care established by various psychologist associations and Colorado state law.  Further, he claimed that the letter could subject CDHS to a potentially contentious custody battle.  Mr. Polunas, knowing that Dr. Kent had behaved in a derogatory and hostile fashion towards his female subordinates and Dr. Cappello in particular, and knowing that the claims Dr. Kent made in his investigation were factually inaccurate, placed Dr. Cappello on administrative leave in June 2019 for approximately five months.  Then, in July 2019, Dr. Kent filed an ethics complaint against Dr. Cappello's license to practice psychology with the Colorado Board of Psychologist Examiners ("Board"), claiming she had practiced unethically and outside generally established standards of care.  Despite the confidential nature of complaints to the Board, Dr. Kent communicated his allegations, and the fact he had filed a Board complaint, to numerous persons in the profession and at CDHS, causing significant harm to Dr. Cappello's reputation and livelihood.  Likewise, Mr. Polunas communicated to professional staff and executive management that Dr. Cappello had committed ethics violations and violated state law in her practice at Ft. Logan.  In November 2019, Mr. Polunas disciplinarily demoted Dr. Cappello, who had a protected property interest in her position pursuant to Colorado Constitution, based on the same false and inaccurate allegations brought by Dr. Kent.  Prior to Dr. Cappello's return to employment from administrative leave, Mr. Polunas abolished the TIC program as well as Dr. Cappello's position managing the program.  Upon her return from administrative leave in November 2019 and despite her requests, Dr. Cappello was given no formal position with Ft. Logan and was given no regular duties; rather, she was

told to fill in for other psychologists as needed and was specifically directed not to form

any therapeutic relationships with patients.  In January 2020, Dr. Cappello, who still had

no formal position with Ft. Logan and no regular duties, resigned from her employment

with CDHS, finding the working conditions intolerable and in conflict with her

professional standards.  In October 2020, after pending at the Board for more than a

year, the complaint filed by Dr. Kent was dismissed on the Board's own motion, finding

that the matter did not warrant commencement of formal proceedings against her

license to practice psychology.

## II.  PARTIES

2.  Plaintiff Holly Cappello is and was a resident of the State of Colorado at the time

her claims arose and was an employee of Defendant CDHS in Denver, Colorado.

3.  Defendant CDHS, which employs approximately 5,000 persons, is an agency of

the State of Colorado.  Ft. Logan is located in Denver.

4.  Defendant David Polunas was employed by Defendant CDHS as the Director of

Colorado Mental Health Institute at Ft. Logan, a state owned and operated psychiatric

hospital within the Office of Behavioral Health, which is a division of CDHS, at the time

these claims arouse and is a resident of the State of Colorado.

5.  Defendant Alan Kent was employed by CDHS as the Director of Psychology at

Colorado Mental Health Institute at Ft. Logan at the time these claims arouse and was

and is a resident of the State of Colorado.

## III.  JURISDICTION AND VENUE

4

6.   Jurisdiction for Plaintiff's claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII"), is conferred pursuant to 28 U.S.C. §1331 and 42 U.S.C. §2000e-5.  Supplemental jurisdiction over Plaintiff's state law claims exists pursuant to 28 U.S.C. §1367 because Plaintiff's state and federal claims arise out of a common nucleus of operative facts.

7.   Jurisdiction is conferred pursuant to 42 U.S.C. §1983 for violations of the Due Process clauses of the United States Constitution and Colorado state constitution.

8.   Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b), because the unlawful acts giving rise to Plaintiff's claims occurred within the jurisdiction of the United States District Court for the District of Colorado.

9.   Plaintiff has complied with all administrative, jurisdictional and legal prerequisites to filing of this action and received her notice of right to sue from EEOC, dated September 24, 2020.

## IV. GENERAL ALLEGATIONS

10. Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

11.  Plaintiff, Holly Cappello, Psy.D., earned her Doctor of Psychology from University of Denver in 2001.  She started as a pre-doctoral intern at Aurora Mental Health Center in 1998 and was subsequently hired there.  She worked as a staff psychologist and was eventually promoted to the Director of Child & Family Outpatient Services, Director of Integrated Health, and the Assessment Coordinator, which were filled concurrently beginning in 2005.  In these positions, she supervised

5

multidisciplinary teams made up of psychologists, psychiatrists, nurses, social workers, licensed counselors, licensed marriage & family therapists, peer support specialists, case managers, and administrative staff.  She also led a team of trauma therapists to provide therapeutic care in the aftermath of the Aurora theater shooting.  Dr. Cappello was a member of the pre-doctorial internship program throughout her employment at Aurora Mental Health Center and taught seminars on supervision, assessment, child psychopathology, trauma, and professional development.  She also provided pre- and post-doctoral supervision to psychology interns.  She presented at local and national conferences on treating childhood and adult traumatic stress.  Dr. Cappello was certified as a family and child expert in family courts in Denver, Adams and Arapahoe counties and testified as an expert approximately 50 times.

12. In 2013, then governor John Hickenlooper established funding through the state legislature to improve mental health treatment in Colorado, particularly in response to the Aurora theater shooting.  This included funding to establish a Trauma Informed Care program at Ft. Logan.  Hospital management decided that this program would be staffed by a lead psychologist and social worker hired to provide direct clinical services to patients and participate in changing Ft. Logan's culture to become more trauma informed.

13. Trauma Informed Care ("TIC") is an organizational and clinical approach to providing care to patients in health care settings.  It is based on the knowledge that many individuals have had traumas in their lives which influence how they respond to experiences in their environment.  This approach considers the prevalent rates of

traumatic experience in patients and staff.   For an organization to be truly trauma informed, the agency needs to integrate knowledge about trauma into policies, procedures, practices, and clinical delivery of service.  It involves structural changes and trauma specific clinical services.

14. Dr. Cappello was hired as the working director for the TIC program in 2013, along with a social worker, who was directed by Dr. Cappello.

15. Once staffing was completed, Dr. Cappello and the social worker designed pamphlets about TIC, gave presentations to staff, attended team meetings to discuss the program and services, and set up subcommittees to help with rewriting policies and procedures to become more trauma informed.

16. Further, Dr. Cappello and the social worker under her direction provided individual and group trauma treatments to patients across all four treatment teams at Ft. Logan

17. Ft. Logan patients, most of whom are there on civil commitments or competency evaluations, are assigned to a particular team of clinicians which may include an attending psychiatrist, lead psychologist, licensed social workers, a patient advocate, a nurse manager and other persons responsible for the evaluation and treatment of a patient assigned to the team.

18. At the organizational level, the goal of the TIC program at Ft. Logan was to decrease seclusions and restraints, decrease hospitalization recidivism rates, and decrease the potential for re-traumatization to patients and staff.

19. Dr. Cappello and the team clinicians worked together to determine the best possible clinical outcome for patients. Given that Dr. Cappello was not a member of a specific team and did not engage in team decisions regarding commitment and competency of patients, patients would often share information with Dr. Cappello that they chose not to share with other members of the team.

20. The team-based psychologists were often involved in civil commitment issues and psychiatrists often requested and were granted authority by courts to use medications against a patient's will.  These necessary actions occasionally lead to conflict between the patients and their clinicians. Dr. Cappello was separate from these legal issues and focused on providing trauma-specific therapies to the patients.

21. Dr. Cappello worked across all teams with many patients and did not always attend every patient related team meeting due to the time constraints.

22. In or about March 2018, Dr. Kent was hired as the Director of Psychology and Internship Program at Ft. Logan.

23. Prior to his hire, Dr. Cappello had acted as the interim director.  Dr. Cappello did not apply for the permanent position as director and had no desire to be in that position, choosing to continue to manage the TIC program.

24. Not long after Dr. Kent's hire, women psychologists under his direct supervision began to experience a contentious relationship with him as their supervisor.

25. In general, psychologists found Dr. Kent as being intolerant of differing opinions from the women psychologists and actions they took.

26. For example, in one of the first meetings with the team psychologists, Dr. Kent declared that yearly performance ratings previously given by Dr. Cappello in her period as interim director to the team psychologists were too high and that they should be corrected downward.

27. Further, conflicts arose between the women psychologists, in particular Dr. Diana Luckman, a team psychologist and associate director for the internship program, and Dr. Kent concerning the direction of the internship program.  In particular, Dr. Kent sought to allow a favored intern candidate to reschedule an internship interview outside of the established times for other interns.

28. The internship program, which is accredited by the American Psychological Association, is highly competitive and takes only a fraction of the candidates who apply. Internships are necessary for all psychologists to become fully accredited in their profession.

29. In a December 2018 meeting, several of the women psychologists questioned whether it was ethically appropriate to grant an alternative interview date for one internship candidate, as directed by Dr. Kent, which was contrary to past practice and policy for the internship program.  Given the competitive nature of the program, interns were required to interview only at set times, without exceptions.

30. In the meeting with Dr. Kent was Dr. Luckman, Dr. Janet Dodd, Dr. Angie Gutjhar, and Dr. Cappello, all women psychologists who were under Dr. Kent's management.

31. Dr. Kent, in a derogatory and demeaning tone, read a letter stating that he had unilateral authority to make the intern interview decision and that team members would have to accept it as such.

32. The meeting became particularly tense and contentious, with Dr. Cappello described the reaction of the women psychologists as "trauma bonding" as it related to Dr. Kent's abusive and authoritarian behavior.

33. Upon Dr. Cappello's statement, Dr. Kent lost emotional control, was visibly shaking and began screaming at the women, stating generally that it was within his authority to make the decision.

34. Several of the women psychologists were emotionally shaken by Dr. Kent's behavior with one woman having to leave work for the day.

35. Dr. Cappello personally experienced difficulties with Dr. Kent soon after his hire. Dr. Kent sought numerous changes without seeking historic information from her or the women staff.  Though Dr. Kent would ask for feedback, he would become hostile when Dr. Cappello provided advice that did not affirm his position.  Dr. Kent would talk over her when she tried to provide him with meaningful input which conflicted with his opinions.

36. Dr. Kent also made derogatory and inappropriate comments to her.  On one occasion in spring 2018 soon after his start, Dr. Kent stated that he believed that the field of psychology needed more men.  He also talked to the women psychologists about the need for what he described as diversity, implying that too many women were on the staff.

37. Dr. Kent accused Dr. Cappello on multiple occasions of "being in a state of learned helplessness." Despite her expertise, which far exceed Dr. Kent's knowledge in the subject matter area of TIC, Dr. Kent would discredit her opinions about TIC and disregard her advisements on the TIC program at Ft. Logan.

38. In a February 14, 2019 meeting between Dr. Cappello, Dr. Kent and Mr. Polunas, Dr. Kent stated he had seen a confidential survey response written by Dr. Cappello regarding Dr. Kent's performance which he did not approve of. Both Dr. Kent and Mr. Polunas were critical of her opinions.

39. On or about February 15, 2019, Dr. Cappello emailed Cynthia Nunez, a human resources representation, describing what had happened in the meeting concerning the survey and stating that she would like her help concerning the meeting as she was now "functioning in a hostile work environment in which retaliation exists."

40. Because of the ongoing conflicts, Dr. Kent and Dr. Cappello engaged in mediation beginning in or about March 2019 in an attempt to resolve the issues.

41. Dr. Kent and Dr. Cappello failed to come to any resolutions and the mediation process was terminated after Dr. Cappello was placed on administrative leave in June 2019.

42. In or about November 2018, based on requests from treatment Team 1, Dr. Cappello began trauma specific therapy with Patient.

43. Patient, a single mother, did not have visitation rights with her child due to a protective order related to Patient's mental health illness. However, Patient continued to have custody rights, which the family court in Pueblo had not revoked.

44. Based on Patient's history and clinical diagnosis, Dr. Cappello and clinicians on Team 1, to whom Patient was assigned, had ongoing discussions about the possibility of supporting her in seeking supervised visitation from the family court with her minor child.  This included discussions with Dr. Gutjahr, the Team 1 lead psychologist, Donna Trowbridge, the patient rights advocate, Miriam Taylor, then the nurse manager, and Denise Gronki, the team social worker.

45. Dr. Richard Hernandez, a Team 1 attending psychiatrist, was aware and took part in some of these discussions.

46. Patient had a history of civil and criminal court cases, as well as commitments at the Colorado Mental Health Institute at Pueblo ("CMHIP") related to those court cases. CMHIP is a state operated forensic psychiatric hospital.

47. Accordingly, beginning in or about January 2019, Dr. Gutjahr, Dr. Cappello, Ms. Trowbridge and others did research into Patient's court proceedings and contacted family court and county protective services persons with knowledge of Patient's cases to gain insight into Patient's legal status as it related to her child.

48. Based on their research, discussions, and assessment that reestablishing a relationship between Patient and her child would assist in her mental health recovery, Team 1 clinicians reached a consensus, approving an effort by Dr. Cappello to support Patient in requesting a hearing in Pueblo family court to seek supervised visitation with her child.

49. Based on her communications with and direction from Team 1 members and her individual therapy sessions with Patient, Dr. Cappello drafted a letter for Patient, dated April 5, 2019.

50. The letter, on Ft. Logan letterhead, was addressed to Pueblo County Courts & Child Protective Services and was about a paragraph long.  It simply stated that Patient was a patient of Dr. Cappello's receiving trauma therapy, that Patient had not had contact with her daughter since 2014 due to commitments at psychiatric hospitals and a protection order requiring supervised visitation, and that Dr. Cappello was "willing to provide supervision so [Patient] and her daughter can communicate by phone or in person."  Further, Dr. Cappello wrote that "unless there are issues of risk or harm to the minor child that I am unaware of I believe contact could be beneficial in strengthening the parent-child bond."

51. Dr. Capello provided it directly to Patient to allow her the choice of how to use the letter, which was an important empowerment issue related to her treatment.

52. Throughout her career, Dr. Cappello had provided supervised visitation for patients and had provided such letters of support on numerous occasions.

53. Patient decided to send the letter to the court and was granted a phone call in about April 2019 to schedule a court hearing on the visitation matter, which was monitored by the patient advocate.  A hearing was set on the matter on or about June 26, 2019.

54. In or about late May 2019, Michael Tessean, Deputy Director of the Office of Behavioral Health which oversees operations of the psychiatric hospitals at Pueblo and

Ft. Logan, had email communications with Defendant David Polunas.  Mr. Teesean stated that CDHS executive management, who had been contacted by persons in the community related to the minor child, was concerned that Dr. Cappello had made the decision to draft such a letter and give it to her patient.

55. Dr. Kent, who was also part of these emails, described Patient's family court situation as possibly being "a reflection of a potentially contentious custody situation."

56. Mr. Polunas forwarded the April 5th letter to Dr. Kent and directed him to investigate the issues that related to the April 5th letter that was received by Mr. Tessean.

57. Beginning in late May 2019, Dr. Kent initiated an investigation, without direction or oversight from management or human resources, into the April 5th letter.

58. Dr. Kent and Dr. Cappello were still in the process of mediating their conflicts at the time Dr. Kent initiated the investigation.

59. Dr. Kent chose not to interview some clinicians and staff on Team 1 who had substantive knowledge of the situation, including Donna Trowbridge, the patient advocate for Patient.

60. Dr. Kent did choose to interview persons who were not on Team 1 and had no knowledge of the research, discussions and decisions made by Team 1 regarding Patient.

61. When Dr. Kent did question persons on Team 1, he failed to completely interview them or disregarded statements that supported the reason that Dr. Cappello gave the letter to Patient.

62. On or about June 3, 2019, Dr. Kent had a conversation with Dr. Gutjahr, the lead psychologist on Team 1.  Dr. Gutjahr told Dr. Kent that Team 1 clinicians had researched and conferred on the issue of visitation for Patient, were aware of the April 5th letter and were supportive of Dr. Cappello offering to family court to provide supervised visitation for Patient.

63. On or about June 7, 2019, Dr. Kent spoke with Denise Gronki, the Team 1 Social worker.  She stated she was aware of discussions concerning Patient and the proposal of support for supervised visitation.

64. Dr. Kent never talked to Donna Trowbridge, the patient advocate on Team 1, about Patient and the discussions on Team 1 related to supporting supervised visitation.

65. Dr. Kent knew Ms. Trowbridge wanted to talk to him about Dr. Cappello's letter but chose not to talk to her. Dr. Kent decided not to talk to Ms. Trowbridge because he believed there was no reason to do so.

66. Dr. Kent never talked to Miriam Taylor, the nurse manager on Team 1, about Patient and the discussions on Team 1 related to supporting supervised visitation.

67. Of the approximately 16 persons Dr. Kent spoke with regarding the April 5th letter, approximately four were on Team 1.

68. The only documentation from Dr. Kent's investigation was his own personal notes.  He failed to make audio recordings of the interviews and failed to obtain written statements from persons.

69. Dr. Kent failed to ask specific and relevant questions that would have supported Dr. Cappello's actions.  When interviewing Dr. Gutjahr, who stated Team 1, including

Dr. Hernandez, did discuss supporting visitation for Patient and was supportive of a letter from Dr. Cappello, he chose not to ask Dr. Hernandez about this statement.

70. Dr. Kent also solicited persons who had ongoing complaints with Dr. Cappello to give negative feedback concerning her, despite the absence of any first-hand knowledge of the events in question.

71. On or about June 7, 2019, Dr. Kent sent his investigation findings to Mr. Polunas, finding what he described as significant clinical errors and false statements on the part of Dr. Cappello.

72. Dr. Kent failed to put in his investigation report that Dr. Gutjahr stated she and Team 1 clinicians had discussions about supporting Patient through supervised visitation, were aware of Dr. Cappello's letter and supported the action.

73. Dr. Kent reported that Dr. Hernandez, the team psychiatrist, had no knowledge of the discussions related to Patient, but failed to report that Dr. Gutjahr said he was part of the discussions and was in support.

74. Dr. Kent failed to talk to Dr. Bert Dech, another Team 1 psychiatrist, who had knowledge of the team discussions related to Patient.

75. Dr. Kent failed to report that Ms. Gronki was aware of discussions related to Patient.

76. Dr. Kent failed to report that he did not ask Ms. Taylor about her knowledge of the issue.

77. Dr. Kent failed to report that he had not spoken with Ms. Trowbridge, the patient advocate.

78. Dr. Kent falsely stated to Mr. Polunas that Team 1 members were unaware of Dr. Cappello's drafting of the letter for Patient.

79. Dr. Kent failed to state in his report that he did not talk to all the Team 1 members.

80. Dr. Kent reported Dr. Cappello did not document the letter in the patient record, but failed to report that Dr. Cappello sent the letter to records staff to be scanned into the patient record.

81. Dr. Kent, in his report, alleged that Dr. Cappello "may have been trying to conceal this activity."

82. Dr. Kent erroneously reported that TIC therapists, referring to Dr. Cappello, "operate as consultants to the treatment team" where Dr. Cappello was empowered to provide therapeutic services for patients in general.

83. Dr. Kent erroneously reported that Dr. Cappello had failed to document Patient's "traumatic issues related to losing her child."

84. Dr. Kent failed to report to Mr. Polunas that in an earlier assessment, he had reviewed Dr. Cappello's chart notes for Patient and found that she had "thoroughly documented [her] sessions with client around her parenting issues."

85. Dr. Kent erroneously reported that Dr. Cappello had no first-hand knowledge of the reasons there was a protective order for Patient, failing to report that Dr. Cappello, Dr. Gutjahr and Ms. Trowbridge had all researched Patient's prior court records.

86. Dr. Kent erroneously referenced in his report that Dr. Cappello had made assessments and recommendations about the Patient-child custody situation, when in

fact Dr. Capello had simply offered to provide supervised visitation for Patient and her child.

87. Dr. Kent reported to Mr. Polunas that he had determined that Dr. Cappello had violated American Psychological Association ("APA") ethics guidelines and she had practiced outside of generally accepted standards of care for the profession pursuant to Colorado statute.

88. On or about August 13, 2019, in response to an email request from Mr. Polunas, Dr. Kent stated that Dr. Cappello had violated Colorado statute concerning record keeping standards, had practiced outside of generally accepted standards of practice pursuant to Colorado statute, and had violated three APA ethical guidelines.

89. In early June 2019, Dr. Kent began working on an ethics complaint against Dr. Cappello's license to practice psychology to be filed with the Colorado Board of Psychologist Examiners ("Board").  In drafting his complaint to the Board, Dr. Kent again used the inaccurate and false information that was the basis of his report to Mr. Polunas.

90. On or about July 9, 2019, Dr. Kent filed his complaint with the Board, claiming that Dr. Cappello had violated APA ethics rules and practiced outside of generally accepted standards of practice as established in Colorado.

91. In the complaint to the Board, Dr. Kent made false claims.

92. Dr. Kent falsely claimed that Patient had multiple pages of open criminal charges.

93. Dr. Kent falsely claimed that Dr. Cappello was engaged in a custody matter on behalf of Patient when she had merely offered to supervise visitation on behalf of Patient should the court approve supervised visitation.

94. Dr. Kent falsely asserted that Dr. Cappello's actions in drafting the letter was not supported by Team 1.

95. Dr. Kent falsely asserted that Dr. Cappello had rendered an expert opinion to the family court.

96. Both before and after filing the Board complaint, Dr. Kent told staff at CDHS about his complaint as well as his claims that Dr. Cappello had violated ethics standards and practiced outside of generally accepted standards of care.

97. On or about June 5, 2019, Dr. Kent spoke with Lorie Sanchez, a CDHS employee, about his allegations that Dr. Cappello had violated certain ethics standards in her practice and his intent to file a complaint against her license with the Board.

98. On or about June 17, 2019, Dr. Kent spoke with Dr. Peggy Hicks, a CDHS psychologist and Director of the Trauma Informed Care program at CMHIP, about his allegations that Dr. Cappello had violated APA ethics standards and practiced outside of generally accepted standards of care.  Dr. Kent also stated to Dr. Hicks he intended to file a complaint against her license with the Board.

99. On or about July 8, 2019, Dr. Kent also sent his completed, Board complaint to Nancy Kehiayan, Director of Nursing at Ft. Logan.

100.     On about July 12, 2019, Dr. Kent communicated with Lyn Snow, an employee at Ft. Logan, communicating with her that Dr. Cappello had violated APA

ethics guidelines and had practice outside of generally accepted standards of care for a psychologist which would require filing a complaint with the Board against Dr. Cappello's license to practice.

101.     Dr. Kent communicated with Terry Scoficio, director for the Office of Behavioral Health in CDHS, that Dr. Cappello had violated ethics rules and practiced outside of generally accepted standards of care for a psychologist.

102.     Colorado statute, which Dr. Kent had reviewed, provides that complaints against a person's license to practice must be treated as confidential.

103.     On June 27, 2019, Mr. Polunas received an email from Dr. Cappello stating that Dr. Gutjahr not only knew of the letter, but that the Dr. Gutjahr and Team 1 staff were setting up transportation for Patient to go to court for a hearing regarding supervised visitation based on the letter.

104.     In July 2019, three of the women psychologists, Dr. Janet Dodd, Dr. Gutjahr, and Dr. Luckman, filed a civil rights complaint with CDHS human resources office, claiming that Dr. Kent's continuing actions against the women psychologist were creating a hostile work environment and constituted harassment and discrimination based on sex.

105.     This was the culmination of months of complaints by the women, including numerous emails by Dr. Luckman to Cynthia Nunez, human resources representative, which began soon after the December 2018 meeting.

106.     In response to the women's complaint, Dr. Kent filed his own complaint with the civil rights office, claiming that he was being discriminated against as a male

supervisor by his female subordinates.  Dr. Kent stated he himself, rather than the women, as the victim of sex discrimination.

107.     Richard Fields, an investigator with the civil rights unit of CDHS, conducted the investigation of the complaints by the women and Dr. Kent.

108.     Mr. Fields investigation culminated in a reported to Mr. Polunas on or about August 19, 2019.

109.     Mr. Polunas was interviewed by Mr. Fields as part of the investigation.

110.     Mr. Fields wrote that Mr. Polunas stated to him that Dr. Kent had raised concerns about Dr. Cappello's interactions with Dr. Kent already in in December 2018.

111.     Mr. Polunas believed the allegations by the women psychologists against Dr. Kent were "unfortunate" and that they were "unusual" but had no other opinion about the allegations generally.

112.     Mr. Polunas believed that Dr. Kent had extremely good relationships with all of the hospital management team and with other staff at Ft. Logan.

113.     Mr. Polunas stated to Mr. Fields that he had never gotten one complaint about Dr. Kent and that he had a hard time believing that the women's complaints about Dr. Kent.

114.     Mr. Polunas stated to Mr. Fields that he had received a call from Cynthia Nunez, a human resources employee, about complaints from the women psychologists concerning the December 2018 meeting.

115.     Mr. Polunas stated he was concerned that Ms. Nunez "appeared to be taking the [women] psychologists' side" without understanding the issues and he asked that she be replaced with another HR representative.

116.     Ms. Nunez was the person Dr. Luckman had repeatedly contacted about issues with Dr. Kent since December 2018, with no response, and was the person Dr. Cappello contacted in February 2019 concerning her fear that she was being retaliated against by Dr. Kent.

117.     Mr. Polunas stated to the investigator that he did not have any concerns that women psychologists were suffering negative interactions because they were women.

118.      Mr. Fields reported that Mr. Polunas "clearly thinks highly of [Dr. Kent] and has concerns about a pattern of behavior he believes he is seeing from some of the [women] psychologists that report to [Dr. Kent]."

119.     Dr. Cappello was interviewed by Mr. Fields on or about July 22, 2019 for the investigation.

120.     Dr. Cappello told Mr. Fields that Dr. Kent indicated to her that he believed that they were experiencing difficulty in their professional relationship because he was a man and she was an assertive woman.

121.     Dr. Cappello told Mr. Fields that she had concerns about Mr. Polunas and his interactions with Dr. Kent as it related to the women psychologists.  She stated that Mr. Polunas had not been responsive to repeated requests to help the women, that she

believed that Mr. Polunas and Dr. Kent had "each other's backs" and that a more objective party should review Field's report.

122.    Dr. Kent was interviewed by Mr. Fields as part of the investigation in or about July 2019.  Dr. Kent stated that he viewed Dr. Cappello and the women psychologists who were his subordinates as a "good old girls club" that was trying to get rid of their male supervisor.

123.    Dr. Kent admitted that he had an emotional outburst at the December 2018 meeting, but that he viewed it as being unfair that he was expected not to show emotions while the women psychologists were allowed to, specifically referring to individual women who left the meeting crying.

124.    When asked what remedy Dr. Kent sought for his complaint against the women psychologist, Mr. Fields reported that he wanted "personnel actions to be taken against the employees found to have violated agency policies."

125.    Mr. Fields stated in his report that Dr. Kent's decision to file a formal complaint against his staff right after they filed complaints about Dr. Kent's treatment of women in the workplace as "troubling and could be viewed as retaliation under certain circumstances."

126.    In his report, Mr. Fields stated that Dr. Kent "suggested that he may have actually written [his investigation] report somewhat differently had [Dr. Cappello] accepted any responsibility for her actions."

127.     When Mr. Fields questioned Dr. Kent as to whether it was appropriate for him to conduct an investigation of Dr. Cappello given the failed mediation and tensions that existed.  Dr. Kent said he had no problems with conducting it.

128.     On August 22, 2019, Dr. Kent emailed Mr. Polunas and Mr. Fields, claiming that he had spoken with child psychologist who was a "national expert" who advised Dr. Kent that Dr. Cappello had engaged in "improper conduct" that was "contrary to professional standards" and that she practiced outside of "generally accepted standards of practice."

129.     Mr. Fields finished his report on or about August 19, 2019 and determined that no discrimination had occurred on the part of any of the employees.

130.     Mr. Fields provided his report to Mr. Polunas.

131.     Mr. Polunas discussed the Fields report with Terry Scofidio, Division Director for the Office of Behavioral Health in CDHS which oversaw Ft. Logan and CMHIP.

132.     Ms. Scofidio was aware of the conflicts between Dr. Kent and the women psychologists, including Dr. Cappello.

133.     Ms. Scofidio offered no response to Mr. Polunas on the conflicts between Dr. Kent, Dr. Cappello, and the other women psychologists.

134.     Ms. Scofidio took no action in relation to the Fields report.

135.     Upon learning that no action would be taken on his complaint, Dr. Kent began considering a resignation from his position as Director of Psychology.

136.     On or about September 5, 2019, Dr. Kent met with Mr. Polunas and Ms. Scofidio to register his complaints related to the investigation, Dr. Cappello, and the women psychologists.

137.     On or about September 17, 2019, Dr. Kent tendered his resignation letter. In it, he stated that the "ongoing retaliation and harassment against me by these subordinate employees won't be addressed by any disciplinary action and I must accept the persistent harassment and tolerate their frivolous, retaliatory complaints . . .."

138.     In his resignation letter, Dr. Kent stated that his women psychologist "subordinates" had "violated state and federal discrimination and harassment laws."

139.     In referring to a meeting with Mr. Polunas and Ms. Scofidio, he stated that he was informed that he would have to tolerate the women's' "frivolous, retaliatory complaints whenever I make a decision . . . within the scope of my legitimate supervisory authority."

140.     Again, referring to the meeting with Mr. Polunas and Ms. Scofidio, Dr. Kent stated his frustration that the actions of "these subordinate employees won't be address by any disciplinary action" despite being "told that their behavior isn't appropriate nor acceptable."

141.     Dr. Kent complained about the "gender-based attacks on" him, that his "rights were violated by the [CDHS] Office of Civil Rights, and specifically by investigator Mr. Fields," and that his women psychologist subordinates "raised this question to support their girlfriend and colleague [Dr. Cappello]."  He also complained that his examples of "gender-based characterizations of me" were not addressed by CDHS.

142.     Dr. Kent readily admitted that his use of the word "girlfriend" in referring to Dr. Cappello and the phrase "old girls club" in referring to the women psychologists was sexist and that he intentionally did so to demonstrate that the women would ignore his authority as director because he was male.

143.     Mr. Polunas believed that Dr. Kent was the subject of harassment and insubordination and that Dr. Kent was justified in his feelings about his staff.

144.     Dr. Kent subsequently filed an employment appeal with the State Personnel Board, claiming he had been constructively discharge based on sex discrimination; however, he subsequently withdrew the appeal.

145.     In the appeal, he referred to the complaints of the women subordinate psychologists as "degrading and unfounded" and that CDHS was unwilling to put an end to their "repeated gender-based attacks" on me.

146.     He claimed that the women psychologists filed the complaint to "support their girlfriend and colleague," a reference to Dr. Cappello.

147.     On August 29, 2019, Dr. Kent sent his confidential Board complaint to Mr. Polunas, claiming that it was "important for you and [Ft. Logan] to have a copy . . .."  He claimed that the complaint, like the report to Mr. Polunas, was "objective and factual" and made "without offering opinions and recommendations."

148.     Despite his claims that Dr. Cappello had violated state law and professional ethics guidelines, Dr. Kent stated he would not have reported the claimed ethics violations to the Board had Dr. Cappello simply accepted responsibility for her actions and apologized to him.  In an email to Mr. Polunas in August 2019, Dr. Kent

stated that, "as Holly's [Dr. Cappello's] supervisor, below is what I would have considered an acceptable response.  Had I received this type of reaction, there would be no Board complaint, no personnel action [against Dr. Cappello], and no frivolous complaint against me," meaning the discrimination complaint filed by the women psychologists with human resources.

149.     After the June 2019 report, Dr. Kent continued to assist Mr. Polunas in seeking disciplinary action against Dr. Cappello.  This included lists of questions concerning an internal peer review of Dr. Cappello's work, unrelated to the April 5th letter, which Dr. Kent directed to build further evidence against Dr. Cappello, further accusatory findings from the peer review, and questions concerning ethics violations for Mr. Polunas to use at the pre-disciplinary meeting with Dr. Cappello.

150.     Mr. Polunas relied solely on Dr. Kent to investigate the allegations related to the April 5th letter and direct the peer review used against Dr. Cappello.

151.     Not long before Dr. Kent resigned from employment with CDHS, Mr. Polunas communicated with Dr. Kent, stating that he would take some sort of disciplinary action against Dr. Cappello.

152.     In or about November 2019, Dr. Gutjahr drafted a letter to be sent to the Board concerning the complaint by Dr. Kent against Dr. Cappello's license.  In the letter, she provided a factual basis to correct the false allegations made by Dr. Kent.

153.     In part, the letter stated that there were numerous conversations with Team 1 members and Dr. Cappello regarding the possibility of assisting Patient with re-establishing some contact with her child, that over several months Patient's symptoms

improved significantly to the point that the team believed that some communication with her child would be an important first step in rebuilding her life.  Further, she stated that the treatment team supported Dr. Cappello sending a letter to the court offering supervised visitation.

154.     Dr. Gutjahr approached six Team 1 members with the letter, asking them to sign the letter of support to be provided to the Board.  The Team 1 clinicians who signed the letter included Dr. Gutjahr, Miriam Taylor, Nurse Manager, Denise Gronki, social worker lead, Donna Trowbridge, the patient rights specialist, Dr. Robert Hernandez, a Team 1 psychiatrist, and Dr. Bert Dech, also a Team 1 psychiatrist.

155.     Mr. Polunas was aware of this letter prior to rendering the disciplinary demotion against Dr. Cappello.  However, he never discussed the letter with Dr. Gutjahr or any of the signatories on the letter.

156.     On or about November 19, 2019, Dr. Cappello was given a disciplinary action, demoting her from the classification of a Psychologist II to a Psychologist I along with a pay reduction of approximately 10 percent.

157.     Dr. Cappello was on paid administrative leave from July 1, 2019 to November 19, 2019.

158.     Upon return from administrative leave on or about November 19, 2020, Dr. Cappello met with Mr. Polunas and a human resources representative.  Dr. Cappello was informed that Mr. Polunas had abolished the TIC program at Ft. Logan as well as her former position.

159.     The TIC program was widely viewed by team psychologists as a success and therapeutically valuable for patients at Ft. Logan who previously had not had access to such therapy and that loss of the program resulted in a diminishment of the quality of therapeutic services for patients.

160.     Mr. Polunas generally claimed that the hospital was moving in a new direction and that abolishment of the TIC program was part of a "redesign."

161.     Mr. Polunas did not have another position for her to take upon her return to Ft. Logan, but he direct Dr. Cappello to report to Chad Shaklee, the Director of Social Work at Ft. Logan, and stated that he would give her a new position and job duties. Further, Mr. Polunas directed her not to form therapeutic relationships with clients.

162.     Dr. Cappello and Mr. Shaklee met after her return.  Mr. Shaklee stated he did not have a position description ("PD") for Dr. Cappello and did not have regular duties for her, despite the directive from Mr. Polunas.

163.     Mr. Shaklee told Dr. Cappello to fill in for other psychologists as needed, but specifically directed her not to resume her former duties and not to form any professional relationships with patients at the hospital that might give the impression that she was providing therapeutic services to them.

164.     Mr. Shaklee and Dr. Cappello had several subsequent meetings.  Mr. Shaklee stated that "things were changing" around Ft. Logan and probably sometime in January he would have a PD for Dr. Cappello.

165.     Mr. Shaklee told Dr. Cappello to speak with the team-based psychologists about what they wanted her to do. She did so but the team-based psychologist had no

direction from management as to what to give Dr. Cappello and were unclear about her duties because of the limits on what Dr. Cappello could do.  This was because they were told Dr. Cappello could not to form therapeutic relationships with patients and the psychologists believed that this would be confusing for patients with whom Dr. Cappello had previously worked.

166.     In the two months Dr. Cappello was at Ft. Logan following the November 19th meeting with Mr. Polunas and the human resources representative, she was never provided a PD nor was she given formal duties.

167.     At one point, Mr. Shaklee discussed with Dr. Cappello the possibility of doing forensic assessments for criminal court cases.  However, Dr. Cappello responded that, given that she was not qualified in the area of forensic psychology and had not practiced in that area, it would be ethically inappropriate for her to do so.

168.     Mr. Shaklee also expressed biases against Dr. Cappello.  According to Mr. Fields, Mr. Shaklee stated that Dr. Kent had, early on in Kent's tenure, raised concerns about the women psychologists under his supervision.  Mr. Shaklee claimed that the psychology team was being underutilized and that the psychologists wanted to protect the status quo. He stated that he believed this was a classic case of state employees believing they could tell their supervisor what they will and will not do and that the women psychologists were a difficult group to manage.

169.     Mr. Shaklee stated to Mr. Fields that the entire hospital management group, of which he was a member, had concerns about how Dr. Cappello conducted as it related to the matter with Patient.

170.     Upon her return, line staff were welcoming and said they were glad Dr. Cappello was back; however, they were confused about her lack of a position.  Dr. Cappello found Ft. Logan administrators to be indifferent towards.  Some would not respond when she said "hello" or "good morning."

171.     Ft. Logan management and other staff knew that Dr. Cappello's license to practice was under investigation because of the complaint filed by Dr. Kent with the Board.

172.     Dr. Cappello remained without duties and was prohibited from continuing her previous TIC work, which was the particular specialty for which she was hired.

173.     Dr. Cappello continued to be prohibited from forming therapeutic relationships with patients.

174.     Dr. Cappello was questioned by numerous people about what happened to her and why a complaint was filed against her license to practice psychology.

175.     Dr. Cappello's work situation became untenable as the TIC program was abolished, she had no formal duties, no position description, she received no direction from management, and she was prohibited from forming therapeutic relationships with patients.  Accordingly, Dr. Cappello tendered her resignation effective January 16, 2020.

176.     Subsequent to her resignation, Dr. Cappello searched for other employment and considered opening her own practice.

177.     Dr. Cappello was effectively barred from opening her own psychology practice because she was informed that malpractice insurers would not provide her with

a policy because of the pending complaint against her license.  The pending complaint also affected her ability to find work with employers in her profession.

178.     Persons in the professional community in metro Denver told Plaintiff they were aware of what had happened at Ft. Logan and that a complaint had been filed against her license.

179.     She began volunteer work with the Colorado Coalition for the Homeless as a staff psychologist.  She was eventually given paid work on a part-time basis in or about June 2020.

180.     In October 2020, the Board of Psychologist Examiners dismissed the Kent complaint on the Board's own motion without disciplinary action, finding that the matter did not warrant commencement of formal proceedings against her license to practice psychology.

## V. LEGAL CLAIMS FOR RELIEF

### FIRST LEGAL CLAIM FOR RELIEF
### (Sex Discrimination, disparate impact, in Violation of Title VII, against Defendant CDHS)

181.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

182.     Plaintiff is a woman which was known to Defendant CDHS and thus a member of a protected class under Title VII.

183.     Plaintiff was an employee of Defendant CDHS within the meaning of Title VII.

184.     Defendant CDHS has more than 15 employees and is an employer within the meaning of Title VII.

185.     Plaintiff suffered an adverse action when she was disciplinarily demoted from her position as a Psychologist II to a Psychologist I by Defendant CDHS and suffered a pay reduction.

186.     Plaintiff suffered an adverse action in the form of a constructive discharge when Defendant CDHS abolished TIC program and her position, failed to give her any new position or regular duties at Ft. Logan, and prohibited her from forming therapeutic relationships with clients, creating a work environment so intolerable that a reasonable person would not be able to stay employed at Ft. Logan.

187.     An inference of discrimination existed where Defendant CDHS intentionally treated Plaintiff in a discriminatory fashion because she was a woman, through its employees Defendant Polunas by disregarding her statements and evidence that she had not acted unethically or practice outside the generally accepted standard of care for a psychologist, disregarded evidence from women employees that showed Plaintiff had worked with and had approval from the treatment team for Patient, yet believed the false claims and allegations of her male superior, Defendant Kent.

188.     Defendant CDHS ignored Plaintiff's claims that she was being treated in a derogatory fashion as a woman by her supervisor Defendant Kent but accepted and gave validation to claims made by male Defendants Kent and Polunas that the women psychologists acted inappropriately in the workplace.

189.      Defendant CDHS ignored the complaints of Plaintiff and other women psychologists that Defendant Kent treated women in a derogatory fashion because they were women.

190.      Defendant CDHS ignored Defendant Kent's sexist statements, as reported by Mr. Fields in his investigation and stated by Defendant Kent in his own resignation letter.

191.      Defendant CDHS had no legitimate business reason for demoting Plaintiff and constructively discharging her where facts showed that Plaintiff's action in writing the letter for Patient was part of a collaborative process with Team 1 clinicians, that the Team 1 consensus decision was the actions of Plaintiff were in Patient's best interest, and the action was within the generally accepted standards of practice.

192.      Defendant CDHS had no stated legitimate business reason for abolishing the TIC program where it was viewed by clinicians as therapeutically valuable for patients.

193.      Plaintiff suffered economic losses in the form of a pay reduction from the demotion, lost pay when she was constructively discharged from her position and had difficulty finding other employment in her profession because a complaint had been filed by Defendant Kent against her license to practice psychology.

194.      The demotion and constructive discharge by Defendant CDHS, along with the complaint against her license to practice psychology by Defendant Kent, cause harm to Plaintiff's professional reputation, her ability to pursue her profession in private

practice, her ability to find other employment in her profession, harmed her economic

livelihood, and caused her emotional distress.

195.     Plaintiff suffered harm to her career and reputation, as well as emotional

distress, where Defendants made false allegations that she had violated ethics

provisions, practiced outside of the generally accepted standard of care for a

psychologist and that she had falsified records.

**SECOND LEGAL CLAIM FOR RELIEF**
**(Sex Discrimination, disparate impact, in Violation of the Colorado Anti-
Discrimination Act against Defendant CDHS)**

196.     Plaintiff incorporates by reference all paragraphs of this Complaint as

though fully alleged herein.

197.     Plaintiff is a woman which was known to Defendant CDHS and thus a

member of a protected class under CADA.

198.     Plaintiff was an employee of Defendant CDHS within the meaning of

CADA.

199.     Defendant CDHS has more than 15 employees and is an employer within

the meaning of CADA.

200.     Plaintiff suffered an adverse action when she was disciplinarily demoted

from her position as a Psychologist II to a Psychologist I by Defendant CDHS and

suffered a pay reduction.

201.     Plaintiff suffered an adverse action in the form of a constructive discharge

when Defendant CDHS abolished TIC program and her position, failed to give her any

new position or regular duties at Ft. Logan, and prohibited her from forming therapeutic

relationships with clients, creating a work environment so intolerable that a reasonable person would not be able to stay employed at Ft. Logan.

202.     An inference of discrimination existed where Defendant CDHS intentionally treated Plaintiff in a discriminatory fashion because she was a woman, through its employees Defendant Polunas by disregarding her statements and evidence that she had not acted unethically or practice outside the generally accepted standard of care for a psychologist, disregarded evidence from women employees that showed Plaintiff had worked with and had approval from the treatment team for Patient, yet believed the false claims and allegations of her male superior, Defendant Kent.

203.     Defendant CDHS ignored Plaintiff's claims that she was being treated in a derogatory fashion as a woman by her supervisor Defendant Kent but accepted and gave validation to claims made by male Defendants Kent and Polunas that the women psychologists acted inappropriately in the workplace.

204.     Defendant CDHS ignored the complaints of Plaintiff and other women psychologists that Defendant Kent treated women in a derogatory fashion because they were women.

205.     Defendant CDHS ignored Defendant Kent's sexist statements, as reported by Mr. Fields in his investigation and stated by Defendant Kent in his own resignation letter.

206.     Defendant CDHS had no legitimate business reason for demoting Plaintiff and constructively discharging her where facts showed that Plaintiff's action in writing the letter for Patient was part of a collaborative process with Team 1 clinicians, that the

Team 1 consensus decision was the actions of Plaintiff were in Patient's best interest, and the action was within the generally accepted standards of practice.

207.    Defendant CDHS had no stated legitimate business reason for abolishing the TIC program where it was viewed by clinicians as therapeutically valuable for patients.

208.    Plaintiff suffered economic losses in the form of a pay reduction from the demotion, lost pay when she was constructively discharged from her position and had difficulty finding other employment in her profession because a complaint had been filed by Defendant Kent against her license to practice psychology.

209.    The demotion and constructive discharge by Defendant CDHS, along with the complaint against her license to practice psychology by Defendant Kent, cause harm to Plaintiff's professional reputation, her ability to pursue her profession in private practice, her ability to find other employment in her profession, harmed her economic livelihood, and caused her emotional distress.

210.    Plaintiff suffered harm to her career and reputation, as well as emotional distress, where Defendants made false allegations that she had violated ethics provisions, practiced outside of the generally accepted standard of care for a psychologist, and that she had falsified records.

**THIRD LEGAL CLAIM FOR RELIEF**
**(Retaliation against protected activity in violation of Title VII against Defendant CDHS)**

211.    Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

212.     Plaintiff brought her concerns about Defendant Kent's discriminatory attitudes towards women to management, including Defendant Polunas and human resources.

213.     Plaintiff, through a state facilitator, engaged in mediation with Defendant Kent in an effort to end his discriminatory attitudes and practices towards herself and other women subordinates.

214.     Plaintiff, in December 2018, told Defendant Kent that she and other women psychologist under his supervision were "trauma bonding" because of his discriminatory attitudes towards women.

215.     Plaintiff reported Defendant Kent's actions in the December 2018 meeting to Defendant Polunas.

216.     Plaintiff reported her concern to human resources that Defendant Kent and Defendant Polunas were retaliating against her because she was a woman.

217.     Plaintiff was interviewed and answered questions during an employer investigation by Richard Fields into the discriminatory and hostile behavior from Defendant Kent and the failure of Defendant Polunas to take action.

218.     Defendant Kent made false allegations against Plaintiff which he provided to Defendant Polunas.  Defendant Polunas knew that the allegations brought to him were false and inaccurate based on information Plaintiff and other women had provided to him.  Defendant Polunas intentionally ignored the information provided by women and instead used the false and inaccurate information provided by Defendant Kent to discipline and demote Plaintiff.

219.     Defendant Polunas knew about Defendant Kent's discriminatory behavior towards Dr. Cappello and other psychologists, yet chose to demote Plaintiff, abolish the TIC program and Plaintiff's position without providing a position or regular duties for Plaintiff upon her return from administrative leave.

220.     Defendant Polunas knew that numerous women, including Plaintiff, had filed complaints against Defendant Kent concerning his derogatory treatment of women. Defendant Polunas liked Defendant Kent and believe he was a good manager who would bring the women psychologists, including Dr. Cappello, under control and make them more subservient to Ft. Logan management.

221.     Defendant Polunas believed that the women psychologists, including Dr. Cappello, were insubordinate and caused Defendant Kent to resign because of their discrimination complaints, which motivated him to discipline Plaintiff, abolish the TIC program and position, and leave her with no position upon her return to employment at Ft. Logan.

222.     Plaintiff suffered economic losses in the form of lost pay when she was demoted and constructively discharged from her position and had difficulty finding other employment because a complaint had been filed by Defendant Kent against her license to practice psychology.

223.     Plaintiff suffered harm to her career and reputation, as well as emotional distress, where Defendants made false allegations that she had violated ethics guidelines, practiced outside of the generally accepted standard of care for a psychologist, and that she had falsified records.

**FOURTH LEGAL CLAIM FOR RELIEF**
**(Retaliation against protected activity in violation of the Colorado Anti-Discrimination Act Against Defendant CDHS)**

224.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

225.     Plaintiff brought her concerns about Defendant Kent's discriminatory attitudes towards women to management, including Defendant Polunas and human resources.

226.     Plaintiff, through a state facilitator, engaged in mediation with Defendant Kent in an effort to end his discriminatory attitudes and practices towards herself and other women subordinates.

227.     Plaintiff, in December 2018, told Defendant Kent that she and other women psychologist under his supervision were "trauma bonding" because of his discriminatory attitudes towards women.

228.     Plaintiff reported Defendant Kent's actions in the December 2018 meeting to Defendant Polunas.

229.     Plaintiff reported her concern to human resources that Defendant Kent and Defendant Polunas were retaliating against her because she was a woman.

230.     Plaintiff was interviewed and answered questions during an employer investigation by Richard Fields into the discriminatory and hostile behavior from Defendant Kent and the failure of Defendant Polunas to take action.

231.     Defendant Kent made false allegations against Plaintiff which he provided to Defendant Polunas.  Defendant Polunas knew that the allegations brought to him

were false and inaccurate based on information Plaintiff and other women had provided to him.  Defendant Polunas intentionally ignored the information provided by women and instead used the false and inaccurate information provided by Defendant Kent to discipline and demote Plaintiff.

232.    Defendant Polunas knew about Defendant Kent's discriminatory behavior towards Dr. Cappello and other psychologists, yet chose to demote Plaintiff, abolish the TIC program and Plaintiff's position without providing a position or regular duties for Plaintiff upon her return from administrative leave.

233.    Defendant Polunas knew that numerous women, including Plaintiff, had filed complaints against Defendant Kent concerning his derogatory treatment of women. Defendant Polunas liked Defendant Kent and believe he was a good manager who would bring the women psychologists, including Dr. Cappello, under control and make them more subservient to Ft. Logan management.

234.    Defendant Polunas believed that the women psychologists, including Dr. Cappello, were insubordinate and caused Defendant Kent to resign because of their discrimination complaints, which motivated him to discipline Plaintiff, abolish the TIC program and position, and leave her with no position upon her return to employment at Ft. Logan.

235.    Plaintiff suffered economic losses in the form of lost pay when she was demoted and constructively discharged from her position and had difficulty finding other employment because a complaint had been filed by Defendant Kent against her license to practice psychology.

236.     Plaintiff suffered harm to her career and reputation, as well as emotional distress, where Defendants made false allegations that she had violated ethics guidelines, practiced outside of the generally accepted standard of care for a psychologist, and that she had falsified records.

### FIFTH LEGAL CLAIM FOR RELIEF
**(Deprivation of Substantive Due Process Property Interest Pursuant to 42 U.S.C. § 1983 Against Defendant Polunas in his individual capacity and Defendant Kent in his individual capacity)**

237.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

238.     Defendant Polunas acted under the color of state law when he was employed by the State of Colorado and used Colorado state statute and state personnel rules to discipline Plaintiff in the form of a demotion.

239.     Defendant Polunas acted under the color of state law when he abolished the TIC program which Plaintiff headed, abolished her position, and failed to give Plaintiff another position or established job duties, and directed her not to form therapeutic relationships with patients, which caused her constructive discharge.

240.     Defendant Kent acted under the color of state law where he was Director of Psychology at Ft. Logan and Plaintiff's supervisor.

241.     Defendant Kent acted under the color of state law where he conducted a workplace investigation, falsely alleging that Plaintiff had made false representations, had practiced in an unethical manner, and had practiced psychology outside of generally accepted standards of care.

242.     Plaintiff was a certified state employee pursuant to Colorado state law and had a protected property interest in her continued employment with the state pursuant to Colo. Const. Art. XII, §13(8).

243.     The actions of Defendant Polunas were arbitrary, irrational and shocking to contemporary conscience and violated Plaintiff's substantive due process rights.

244.     Defendant Polunas knew that Defendant Kent made false allegations, that the Team 1 clinicians had worked with Plaintiff and approved of Plaintiff drafting a letter for Patient and approved her actions in support of Patient.

245.     Defendant Polunas knew that six Team 1 members, including Dr. Hernandez, a team psychiatrist, had signed a letter stating they were aware of Dr. Cappello's letter and were supportive of her actions.

246.     Defendant Polunas intentionally disregarded information from Dr. Gutjahr that Team 1 had worked collaboratively with Plaintiff to research Patient's court history, the source of her mental illness and had made a consensus decision with Plaintiff to provide Patient with a letter to family court stating that Plaintiff could offer supervised visitation for Patient.

247.     Defendant Polunas knew that Defendant Kent, despite the alleged seriousness of his allegations, would not have brought the unethical practice allegations against Plaintiff and would not have filed a complaint against Plaintiff's license to practice psychology if she had simply admitted to wrongdoing, apologized for her actions as Defendant Kent sought and altered her practice standards as Defendant Kent saw fit.

248.     Despite knowing Defendant Kent's claims were false and contradicted by facts provided by women clinicians on Team 1, Defendant Polunas intentionally chose to discipline Plaintiff by demoting her and constructively discharging her from employment at Ft. Logan.

249.     Defendants Polunas and Kent believed that Plaintiff's action in providing a letter to Patient and the family court might subject Defendant CDHS to a contentious custody fight in family court, which they sought to avoid as directed by executive management of CDHS.

250.     Defendants Polunas and Kent disregarded Plaintiff's contention that the family court letter, and supporting Patient in seeking supervised visitation, was in Patient's best medical interest for her recovery.

251.     Defendants Polunas and Kent believed that avoiding a hypothetical contentious custody fight in family court was more important than supporting the best medical interests of Patient for her recovery.

252.     Defendant Polunas knew that Defendant Kent had created a hostile work environment for women, and that women psychologists had complained to human resources concerning the gender hostile work environment.

253.     Despite the complaints, Defendant Polunas directed that the human resources representative responsible for addressing the women's complaints be barred from assisting the women psychologists, including Dr. Cappello.

254.     Defendant Polunas, despite knowing that Defendant Kent's allegations were factually false, unsupported by numerous witnesses and that numerous women

had complained of and filed formal complaints concerning Dr. Kent's hostile actions towards women, chose to deprive Dr. Cappello of her protected property interest in her job by demoting her, abolishing the TIC program she had developed, and failing to provide her with a new position or duties upon her return to employment.

255.    The actions of Defendants Polunas and Kent foreclosed any possibility that Plaintiff would return to employment in the state within her specialty or generally as a psychologist.

256.    The actions of Defendant Polunas and Kent in communicating to others that Plaintiff had violated ethics provisions of the APA and had practiced outside the generally accepted standard of care for a psychologist effectively foreclosed Plaintiff's career in her specialty as a TIC practitioner and profession as a psychologist, which she had developed over decades.

257.    Defendant Kent abused his power as Plaintiff's supervisor in such a fashion as to be shocking to contemporary conscience and violated Plaintiff's substantive due process rights in her continued employment with the state at Ft. Logan.

258.    Defendant Kent used false information and disregarded information to build a false basis for his contention that Plaintiff had acted unethically and practiced outside generally accepted standards of care as a psychologist.

259.    Defendant Kent ignored Dr. Gutjahr's statement to him that Team 1 clinicians had worked with Plaintiff and that they collectively determined that a court letter from Plaintiff supporting supervised visitation for Patient was in Patient's best medical interest.

260.     Defendant Kent intentionally chose not to talk to Donna Trowbridge concerning her work with Dr. Gutjahr and Plaintiff to review Patient's court records and determine what was in Patient's best interest.

261.     Defendant Kent falsely reported in his investigation that Miriam Taylor, the nurse manager on Team 1, had no knowledge of the efforts Plaintiff and Team 1 had engaged in to determine whether Plaintiff's letter was in the best medical interest of Patient.

262.     Defendant Kent inaccurately reported that Dr. Richard Hernandez had no knowledge of the Team 1 communications related to Patient and supervised visitation when evidence was provided to him contradicted his finding

263.     Defendant Kent failed to talk to Team 1 psychiatrist Bert Dech about his knowledge of Team 1 communications concerning Plaintiff's letter as it related to Patient best medical interest.

264.     Defendant Kent selectively included and withheld information and made false conclusions in his investigation report to Defendant Polunas, reporting to him that Plaintiff had practiced unethically and outside the scope of generally accepted standards of care.

265.     Defendant Kent falsely represented that Plaintiff had intentionally withheld information for Patient's chart and claimed that she did so because she had unprofessional boundaries with Patient.

266.     Defendant Kent took his false representations and conclusions and used them as the basis for his complaint to the Colorado Board of Psychologist Examiners against Plaintiff's license to practice psychology.

267.     Defendant Kent represented to numerous persons, including Defendant Polunas, that he would or did file a complaint against Plaintiff's license to practice psychology with the Board of Psychologist Examiners for her unethical actions and practice outside generally accepted standards of care.

268.     Defendant Kent knew that his representations and conclusions were false when he stated by email to Defendant Polunas, and to the civil rights investigator in an interview, that he would not have filed the licensure complaint or recommended disciplinary action against Plaintiff had she simply admitted wrongdoing and apologized in a fashion that was acceptable to him.

**SIXTH LEGAL CLAIM FOR RELIEF**
**(Deprivation of Due Process Liberty Interest Pursuant to 42 U.S.C. § 1983 Against Defendant Polunas in his individual capacity and Defendant Kent in his individual capacity)**

269.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

270.     Defendant Polunas acted under the color of state law where he was personally involved in tasking Defendant Kent in investigating Plaintiff and interacted with Defendant Kent to solicit false and defaming information to support his claim that Plaintiff had violated ethics rules and practiced outside generally accepted standard of care as established by Colorado state law and the APA.

47

271.     Defendant Kent acted under the color of state law where, as Plaintiff's supervisor, he investigated Plaintiff's drafting of a letter concerning her offer of supervised visitation for Plaintiff for Patient and interacted with Defendant Polunas concerning Plaintiff's disciplinary demotion.

272.     Defendants Polunas and Kent infringed upon Plaintiff's liberty interest in her good name by communicating to other persons false claims that Plaintiff had practiced unethically and outside the generally accepted standard of care for a psychologist and stating she would be disciplined based on those false claims.

273.     Defendant Polunas told hospital management, including Chad Shaklee, Coleen Stout, CDHS executive management Terry Scofidio and Michael Tessean, that Plaintiff had violated APA ethics provisions and had practiced outside generally accepted standards of care for psychologists as defined by professional organizations and Colorado state law by drafting a letter offering supervised visitation for Patient.

274.     Defendant Kent communicated with Terry Scofidio, Michael Tessean, Dr. Peggy Hicks, Nancy Kehiayan, the director of nursing at Ft. Logan, employee Lyn Snow, investigator Richard Fields, and employee Lorie Sanchez that Plaintiff had violated APA ethics provisions and had practiced outside generally accepted standards of care for psychologists as defined by professional organizations and Colorado state law by drafting a letter offering supervised visitation for Patient.

275.     Defendant Kent communicated with Dr. Peggy Hicks, Ms. Kehiayan, Defendant Polunas, and Ms. Scofidio, Mr. Tessean and Ms. Sanchez that, based on his investigation into the unethical practice of Plaintiff, he would or did file a complaint

against her license to practice psychology with the Colorado Board of Psychologist Examiners.

276.     Defendants Polunas and Kent knew their statements to others were false where they knew Plaintiff had worked with Team 1 clinicians to determine what was in the best interest of Patient, where Team 1 was supportive of Plaintiff drafting a letter offering supervised visitation, and where Defendant Kent stated to Defendant Polunas he would not have filed the complaint had Plaintiff apologized to him.

277.     Defendant Kent's complaint was baseless where the Board of Psychologist Examiner dismissed Defendant Kent's complaint, finding no factual for his complaint that Plaintiff had violated ethics guidelines or practice standards.

278.     The allegations created by Defendant Kent, used by Defendant Polunas in the personnel disciplinary demotion, and communicated to others by both of them harmed Plaintiff's good name and reputation where persons in the hospital senior management, executive management at Defendant CDHS and management and employees at CMHIP were told that Plaintiff had been disciplined for ethics violations and practicing outside of generally accepted standard of care for psychologists.

279.     Defendants Kent and Polunas used the state personnel disciplinary process and the Board of Psychologist Examiner disciplinary process to harm Plaintiff reputation and ability to practice in her profession despite knowing that the factual allegations were false.

280.     Defendant Kent stated that, despite allegedly finding that Plaintiff had violated ethics provisions and practice standards, he would not have filed a complaint

with the Board of Psychology and Plaintiff would not have received a disciplinary demotion had she just provided him with the type of admission of guilt and apology he expected from her.

281.     Defendant Polunas knew Defendant Kent filed a factually false complaint to the Colorado Board of Psychologist Examiners but did not take any action to prevent Defendant Kent from filing the complaint.

282.     Defendant Polunas based his disciplinary demotion against Plaintiff on the findings of Defendant Kent which he knew were factually false.

283.     Defendant Polunas foreclosed employment opportunities for Plaintiff when he promulgated the findings of his disciplinary action to hospital management and executive management of Defendant CDHS.

284.     Defendant Polunas foreclosed employment opportunities for Plaintiff when he abolished the TIC program and her position with Ft. Logan, directed her not to form therapeutic relationships with patients at Ft. Logan, and failed to give her a new position or regular job duties at the hospital.

285.     Defendant Kent foreclosed employment opportunities for Plaintiff when he promulgated his false conclusions to professionals inside and outside Ft. Logan that Plaintiff committed ethics violations and practiced outside the generally accepted standard of care.

286.     Defendant Kent foreclosed employment opportunities for Plaintiff when he filed a factually false complaint against Plaintiff's license to practice psychology with the Colorado State Board of Psychologist Examiners, preventing her from being able to

obtain malpractice insurance and obtain employment in her profession because of the pending complaint.

287.     Plaintiff, after her constructive discharge, was unable to obtain malpractice insurance because of the pending licensure complaint and thus unable to start a private practice because she was under investigation as a result of Defendant Kent's complaint.

288.     Plaintiff was precluded from seeking other gainful employment opportunities because of Defendant Kent's complaint to the Board against her license.

289.     Defendant Polunas communicated to executive management at CDHS, senior management at Ft. Logan, and senior management at the forensic hospital in Pueblo that Dr. Cappello had practiced unethically and outside the established standard of care and that she would be disciplined for these actions.

290.     Persons came to Dr. Cappello, including graduate interns, stating they had learned that Dr. Cappello had been disciplined for engaging in unethical practice outside the generally accepted standard of care.

291.     Defendants Polunas and Kent infringed upon Plaintiff's liberty interest in her reputation by promulgating false claims that Plaintiff had practiced unethically and outside the generally accepted standard of care for a psychologist and disciplining her for those false claims.

292.     Both Defendant Polunas and Defendant Kent communicated, outside of the confidential personnel process, that Plaintiff had engaged in unethical practice and had practiced outside generally accepted standards of care by drafting a letter for Patient.

293.    Defendant Kent defamed Plaintiff when he communicated, by email and verbally to other CDHS staff who were not part of the confidential investigation, that Plaintiff acted unethically and practiced outside the generally accepted standard of care for a psychologist which required him to file an ethics complaint with the Board of Psychologist Examiners against her license.

294.    Defendant Kent knew that his licensure complaint to the Board was a confidential process pursuant to Colorado statute.

295.    Defendant Kent knew his allegations were false when he stated by email he would not have filed a complaint against Plaintiff's license if she had only admitted wrongdoing and apologized to him in a manner that was acceptable to him.

296.    Defendant Polunas defamed Plaintiff when he communicated with Ft. Logan staff and CMHIP staff that Defendant Kent had determined that Plaintiff had practiced unethically and outside of generally accepted standards of care for a psychologist.

297.    Defendant Polunas knew these allegations by Defendant Kent were false where Dr. Gutjahr emailed him saying clinicians on Team 1 had conferred with each other and approved Plaintiff drafting the letter and knew that Dr. Hernandez had signed a letter of support for Plaintiff stating that he had conferred with Team 1 clinicians and was supportive of Plaintiff drafting the letter.

298.    The communications made by Defendants Kent and Polunas stating that Plaintiff was unfit to practice her profession as a psychologist because she had become

too close to Patient and had violated professional boundaries with her defamed Plaintiff's character and reputation.

299.     Defendant Polunas barred Plaintiff from employment with CDHS where he promulgated to CDHS staff that Plaintiff had practiced unethically and outside the scope of generally acted standards of care, abolished the TIC program and her position, barred her from forming therapeutic relationships with patients, and gave her no position or regular job duties.

### SEVENTH LEGAL CLAIM FOR RELIEF
**(Denial of Equal Protection Under the Law Pursuant to 42 U.S.C. § 1983 Against Defendant Polunas in his individual capacity and Defendant Kent in his individual capacity)**

300.     Plaintiff incorporates by reference all paragraphs of this Complaint as though fully alleged herein.

301.     Plaintiff is a woman and a member of a protected class.

302.     Plaintiff was subject to adverse action when she was disciplinarily demoted by Defendant Polunas and Defendant CDHS.

303.     Plaintiff was subject to an adverse action when Defendant Polunas abolished the TIC program which Plaintiff developed and managed, abolished her position, returned Plaintiff to employment from administrative leave without providing her a new position or regular job duties, and instructed her not to form therapeutic relationships with patients at the hospital.

304.     Defendant Polunas treated women psychologist differently than the similarly situated male employee at Ft. Logan, specifically Defendant Kent.

305.     Defendant Polunas disregarded the statements made by Plaintiff regarding the letter she sent, including the fact that she had worked with clinicians on Team 1 and that they were supportive of the letter offering supervised visitation to the family court, instead accepting as true the allegations brought by her male supervisor, Defendant Kent, who falsely claimed that she had not conferred with Team 1 members.

306.     Defendant Polunas disregarded information from Dr. Angie Gutjahr, a woman, including emails and a letter signed by Team 1 clinicians, who informed him that Plaintiff had conferred and worked with Team 1 members and that they approved and were supportive of the court letter from Plaintiff.

307.     Defendant Polunas disregarded complaints regarding gender-based hostilities and harassment brought forward by the women psychologists who reported to Defendant Kent, instead choosing to support Defendant Kent in his intentionally discriminatory treatment of his women subordinates, including Plaintiff.

308.     Defendant Polunas disregarded information brought by human resources representative, Cynthia Nunez, a woman, that the women psychologist had complaints about gender discriminatory behavior by Defendant Kent towards them, directing that she be removed from her role as a human resources representative given her support of the women.

309.     Defendant Polunas was intentionally discriminatory towards women where he wanted Defendant Kent to remain as director and where he did not have any concerns that Defendant Kent was acting in a discriminatory manner towards the women psychologists because of their protected status.

310.     Defendant Kent, a male, played an exclusive and essential role in selectively obtaining, directing, and disregarding information to Defendant Polunas in building the investigation report he provided to Defendant Polunas which was used to discipline Plaintiff and file the complaint against her license.

311.     In this role as supervisor and investigator, Defendant Kent disregarded information or chose not to obtain information from women who had relevant information, including Dr. Gutjahr, Donna Trowbridge, patient advocate on Team 1, Miriam Taylor, the nurse manager on Team 1, and Denise Gronki, the social worker on Team 1.  He relied exclusively on inaccurate statements from Dr. Richard Hernandez, a man, in building his case against Plaintiff.

312.     Defendant Kent worked directly and intimately with Defendant Polunas to build the case for Plaintiff's disciplinary demotion.

313.     Defendant Kent promulgated the false claims that Plaintiff had practiced unethically and outside generally accepted standards of practice, which adversely affected Plaintiff's return to employment at Ft. Logan and future employment outside of Ft. Logan.

314.     Defendant Kent had intentionally discriminatory attitudes towards women where he described Plaintiff and the other women psychologists as an "old girls club" who, in his opinion, did not submit to his authority as the director, knowing that such a statement had a sexually negative connotation.

315.     Defendant Kent had intentionally discriminatory attitudes towards women where he described Plaintiff as the "girlfriend" of the other women psychologists, knowing that such a statement had a sexually negative connotation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Holly A. Cappello respectfully requests that this Court enter judgment in her favor and against Defendants and award the following:

a) Compensatory and consequential damages including but not limited to emotional distress, harm to professional reputation, career and future employment;

b) Back pay, front pay, benefits and other lost wages to be determined at trial;

c) Punitive and exemplary damages as allowed for by law;

d) Reasonable attorney fees and costs as allowed by law;

e) Prospective relief in the form of injunctive and declaratory relief;

f) Pre- and post-judgement interest, costs and expert witness fees; and

g) Any such other relief as the Court deems just and proper.

**Plaintiff requests a trial by jury on all issues so triable.**

Respectfully submitted this 10th December, 2020.

SCHWANE LAW, LLC

_s/ Mark A. Schwane_
Mark A. Schwane (CO #22677)
501 S Cherry St, 11th flr
Denver, CO  80246
Telephone: (303) 515-7135
Email: mark@schwanelaw.com

Plaintiff's Address
823 South Jackson Street
Centennial, CO 80122